**[ORAL ARGUMENT SCHEDULED FOR MAY 14, 2026]**

**Nos. 25-5241, 25-5265, 25-5277, 25-5310**

---

## IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

PERKINS COIE LLP,

*Plaintiff-Appellee,*

*v.*

UNITED STATES DEPARTMENT OF JUSTICE *et al.,*

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the District of Columbia

---

## BRIEF FOR APPELLEE JENNER & BLOCK LLP

---

KATHLEEN R. HARTNETT
MIRANDA LI
COOLEY LLP
3 Embarcadero Center
20th Floor
San Francisco, CA 94111
(415) 693-2000

MICHAEL A. ATTANASIO
COOLEY LLP
10265 Science Center Drive
San Diego, CA 92121
(858) 550-6000

ELIZABETH B. PRELOGAR
JOSHUA REVESZ
JADE FORD
COOLEY LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004
(202) 842-7800
eprelogar@cooley.com

*Counsel for Appellee Jenner & Block LLP*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES AND RULE 26.1 DISCLOSURE

Pursuant to D.C. Circuit Rules 26.1 and 28(a)(1), Appellee Jenner & Block LLP certifies as follows:

### A.     Parties and *Amici*

All parties and *amici* appearing before the district court and in this Court are listed in the exhibits attached to Appellants' certificate, with two exceptions: The complaint in this case names as defendants Other Agencies Subject to Executive Order "Addressing Risks from Jenner & Block" and Scott J. Bessent, in his official capacity as Secretary of the Treasury.

### B.     Rulings Under Review

References to the rulings at issue appear in Appellants' certificate.

### C.     Related Cases

This case has not previously been before this Court.  This case has been consolidated with *Perkins Coie LLP v. U.S. Department of Justice*, No. 25-5241; *Wilmer Cutler Pickering Hale & Dorr LLP v. Executive Office of the President*, No. 25-5277; and *Susman Godfrey LLP v. Executive Office of the President*, No. 25-5310.  The Court has directed

i

that this case be argued on the same day and before the same panel as

*Zaid v. Executive Office of the President*, No. 26-5009.

**D.    Rule 26.1 Disclosure**

Jenner & Block LLP is an Illinois limited liability partnership with

no parent corporation.   No corporation owns 10% or greater ownership

interest in Jenner & Block LLP.

Respectfully submitted,

*/s/ Elizabeth B. Prelogar*
Elizabeth B. Prelogar

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................... 1

STATEMENT OF THE ISSUES ............................................................. 4

STATEMENT OF THE CASE .............................................................. 5

    A.    Factual Background ........................................................... 5

        1.    Jenner & Block LLP ..................................................... 5

        2.    The Executive Order singling out Jenner ................... 7

        3.    The campaign to punish law firms ........................... 12

    B.    Proceedings Below ........................................................ 13

SUMMARY OF THE ARGUMENT ...................................................... 14

ARGUMENT ................................................................................... 17

I.    THE EXECUTIVE ORDER IS UNCONSTITUTIONAL. ............ 17

    A.    The Executive Order violates the First Amendment by retaliating against protected expression. ........................... 17

        1.    Jenner's advocacy and associations are protected under the First Amendment. ...................................... 18

        2.    The penalties in the Order deter expression. ............. 22

        3.    Jenner's protected conduct is a but-for cause of the Executive Order. ................................................ 23

    B.    The Executive Order abridges the First Amendment rights to speak, petition, and associate. ........................... 29

    C.    The Executive Order is contrary to numerous other constitutional principles. .................................................. 33

II.    THE EXECUTIVE ORDER IS FULLY REVIEWABLE. ............. 34

    A.    The Order's bespoke security-clearance process is reviewable. ...................................................................... 34

    B.    The Order's instruction to investigate Jenner is reviewable. ...................................................................... 43

    C.    The Order's disclosure requirements and access restrictions are reviewable. .............................................. 45

D.    The Order's statement of Administration policy is reviewable. ...........................................................................47

CONCLUSION ......................................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
  570 U.S. 205 (2013)................................................................33

*Am. Bus Ass'n v. Rogoff*,
  649 F.3d 734 (D.C. Cir. 2011) ...........................................31

*Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*,
  72 F.4th 1324 (D.C. Cir. 2023)..........................................42

*Ams. for Prosperity Found. v. Bonta*,
  594 U.S. 595 (2021)........................................................31-32

*Aref v. Lynch*,
  833 F.3d 242 (D.C. Cir. 2016) ....................................... 18, 22

*Baker v. Carr*,
  369 U.S. 186 (1962)..............................................................37

*Borough of Duryea v. Guarnieri*,
  564 U.S. 379 (2011)..............................................................31

*Boy Scouts of Am. v. Dale*,
  530 U.S. 640 (2000) ....................................................... 17, 19

*Chamber of Com. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) ............................................37

*Chambers v. Baltimore & Ohio R.R.*,
  207 U.S. 142 (1907)..............................................................20

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019)..............................................................29

*Dep't of Navy v. Egan*,
  484 U.S. 518 (1988).................................................. 35-39, 43

*Gill v. U.S. Dep't of Just.*,
  875 F.3d 677 (D.C. Cir. 2017) ............................................39

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Laird v. Tatum,*
  408 U.S. 1 (1972)............................................................... 30, 47

*Lane v. Franks,*
  573 U.S. 228 (2014)................................................................... 19

*Lawrence v. Texas,*
  539 U.S. 558 (2003)..................................................................... 6

*Lee v. Garland,*
  120 F.4th 880 (D.C. Cir. 2024).............................................39-41

*Legal Servs. Corp. v. Velazquez,*
  531 U.S. 533 (2001)..............................................................19-20

*Lozman v. City of Riviera Beach,*
  585 U.S. 87 (2018)...................................................... 19-20, 23

*Media Matters for Am. v. Paxton,*
  138 F.4th 563 (D.C. Cir. 2025)..............................................44-45

*Moody v. NetChoice, LLC,*
  603 U.S. 707 (2024)................................................................. 47

*NAACP v. Button,*
  371 U.S. 415 (1963)............................................................ 18, 31

*Nat'l Fed'n of Fed. Emps. v. Greenberg,*
  983 F.2d 286 (D.C. Cir. 1993) .........................................35-37, 40-42

*Nat'l Rifle Ass'n of Am. v. Vullo,*
  602 U.S. 175 (2024)..........................................................1, 4, 13-14

*Nieves v. Bartlett,*
  587 U.S. 391 (2019)............................................................ 17, 23

*Porter v. Lee,*
  328 U.S. 246 (1946).................................................................. 42

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Primus,*
  436 U.S. 412 (1978) ................................................................................ 18

*Ralls Corp. v. CFIUS,*
  758 F.3d 296 (D.C. Cir. 2014) ............................................................... 36

*Rattigan v. Holder,*
  689 F.3d 764 (D.C. Cir. 2012) ............................................................... 38

*Roberts v. U.S. Jaycees,*
  468 U.S. 609 (1984) ......................................................... 19, 21, 24, 31

*Sorrell v. IMS Health Inc.,*
  564 U.S. 552 (2011) ................................................................................ 47

*Stehney v. Perry,*
  101 F.3d 925 (3d Cir. 1996) .................................................................. 36

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) ................................................................................ 45

*Teva Pharms. USA, Inc. v. Sebelius,*
  595 F.3d 1303 (D.C. Cir. 2010) ............................................................. 45

*W. Va. Bd. of Educ. v. Barnette,*
  319 U.S. 624 (1943) ................................................................................ 21

*Williams v. Reed,*
  604 U.S. 168 (2025) .................................................................................. 5

*Witherspoon v. Illinois,*
  391 U.S. 510 (1968) .................................................................................. 5

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

**Constitutional Provisions**

U.S. Const. amend. I ............................................................................... 31

**Statutes**

42 U.S.C. § 2000e ................................................................................... 28

**Other Authorities**

Hearing Before the S. Comm. on the Judiciary, 119 Cong.
  (2026) (statement of Neil M. Barofsky),
  https://perma.cc/H6M7-734F ............................................................... 6

iv

## INTRODUCTION

Our Constitution forbids the government from retaliating against lawyers based on the clients they represent and the people with whom they associate. The executive orders challenged here defy this fundamental precept. As Judge Bates observed, "retaliating against firms for the views embodied in their legal work—and thereby seeking to muzzle them going forward—violates the First Amendment's central command.'" JA2157 (quoting *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024)). Lawyers cannot be effective advocates for their clients if they face sweeping sanctions for their protected speech and associations. And without access to effective advocacy, clients cannot seek to vindicate their rights in court, as they have from before the Nation's Founding. This series of executive orders thus "casts a chill over the entire legal profession" and the legal system itself. JA2167.

The Order targeting Jenner & Block LLP is one in that line. The Order imposes severe sanctions on Jenner because it represents clients with cases adverse to the government and because it formerly associated with a critic of the President. The Order says the quiet part out loud: It criticizes Jenner because it purportedly "engages in obvious partisan

representations to achieve political ends" and commits pro bono resources to cases that assertedly "undermine … the interests of the United States."  And the Order condemns Jenner for (years earlier) employing a critic of the Administration, labeling that association "a concerning indictment of Jenner's values and priorities."

The Order's sweeping penalties aim at the heart of Jenner's ability to represent its clients.  The Order limits access to federal buildings for every one of the Firm's more than 900 attorneys and staff.  It directs federal agencies not to meet, or even engage, with Jenner personnel.  It adopts a one-off process for security clearances held by anyone employed at Jenner, directing that all such clearances be immediately suspended.  It directs cancelation of "any contract … for which Jenner has been hired to perform any service" and announces additional steps to deter clients from associating with the Firm.

The threat to the First Amendment and the legal system posed by these orders is undeniable. In facing down this unprecedented set of sanctions, four targeted firms sued.  But one capitulated, agreeing to change its pro bono policies and to devote $40 million in firm resources to causes the Administration supports.  Eight others followed suit,

2

collectively pledging $900 million more in legal services. As the White House put it, the settlements built the President "an unrivaled network of Lawyers" to advance his agenda. JA2025.

Faced with defending the indefensible—and after wavering on whether to maintain this appeal at all—the government has little to say. On the merits, it protests that the Order has nothing to do with Jenner's representations or associations, but instead was prompted by unspecific and unsubstantiated allegations of hiring discrimination. To read the Order is to refute that argument. Context rebuts it, too. Each of the orders takes aim at firms that have something else—something obvious—in common: they represent clients, advocate positions, and associate with people the Administration does not like.

Unable to avoid the Order's retaliatory intent, the government seeks to obscure it, launching sanction-by-sanction reviewability arguments to distract from the Order's integrated set of penalties. But the entire Order systematically punishes Jenner for its protected advocacy and association, and the entire Order must therefore fall.

At any rate, the government's effort to divide and defend the Order collapses under scrutiny. The government primarily contends that the

3

Order's Jenner-specific security-clearance process is unreviewable even if it is unconstitutionally retaliatory. But under this Court's precedent, the judiciary is fully capable of evaluating the legality of policy changes to the methods for adjudicating security clearances. Insulating those policies from review "would equally bless blanket security-clearance suspensions for all Muslims, Catholics, or disabled people." JA2179. That is not the law. The government's remaining reviewability arguments are similarly detached from precedential or factual support. The district court thus properly reviewed the entire Order.

That review is not about "tell[ing] the President what to say." U.S. Br. 1. It is about what the government, under our Constitution, may not do. Government officials "can share [their] views freely," but they cannot wield the government's immense powers to "punish" lawyers for their client advocacy and their associations. *Vullo*, 602 U.S. at 188. This Court should affirm the judgment below.

## STATEMENT OF THE ISSUES

1.     Whether the Executive Order targeting Jenner & Block LLP violates the First Amendment or any other constitutional constraint.

2.     Whether the Executive Order is immune from judicial review.

4

## STATEMENT OF THE CASE

### A.    Factual Background

#### 1.    Jenner & Block LLP

Jenner is a preeminent global law firm.  Founded in Chicago in 1914, the Firm has seven offices across the United States and Europe, over 500 lawyers, and more than 900 total personnel.  JA2026-28.  The Firm is known for industry-leading practices in litigation, global investigations, corporate transactions, regulatory advising, and government controversies.  JA2028.  The Firm serves companies and institutions across a variety of sectors, including technology, telecommunications, hospitality, real estate, finance, transportation, education, energy, aerospace, and defense.  *Id*.

Jenner is also known for its unparalleled commitment to high-impact pro bono representations.  The American Lawyer has ranked it number one in the nation for pro bono work for 12 of the past 15 years.  JA2031.    Jenner attorneys representing indigent individuals are responsible for pathmarking precedents, including *Williams v. Reed*, 604 U.S. 168 (2025), *Lawrence v. Texas*, 539 U.S. 558 (2003), and *Witherspoon v. Illinois*, 391 U.S. 510 (1968).  *See* JA2031-33, 2037-38.

For all clients, Jenner lawyers regularly pursue matters of paramount public importance. Albert Jenner challenged the constitutionality of the House Committee on Un-American Activities on behalf of his client, a prominent scientist, and served as the Republican Counsel to the Watergate Commission. JA1771, JA2032. Later, the Firm challenged the constitutionality of the independent-counsel statute on behalf of Theodore B. Olson. JA2032. The Firm also represented MCI Telecommunications Corp. in the historic case that led to the break-up of AT&T. *Id.* Since the start of 2025, the Firm won a trial holding the nation's largest egg producers and industry groups liable for conspiring to inflate egg prices, JA1775, achieved groundbreaking victories for universities that preserved billions of dollars in federal grant funding, JA2045, and won a critical ruling permitting victims of terrorism to hold foreign state-owned entities accountable for providing material support to terrorist groups, JA1775. Meanwhile, one Jenner partner serves as an independent ombudsman overseeing the investigation into Credit Suisse's previously unreported Nazi ties, Hearing Before the S. Comm. on the Judiciary, 119 Cong. (2026) (statement of Neil M. Barofsky), https://perma.cc/H6M7-734F, while another served as Special Counsel to

6

Chairman Mike Kelly and House Republicans on the Task Force on the Attempted Assassination of Donald J. Trump, JA2033. In these and all its matters, Jenner has achieved extraordinary results through zealous advocacy, standing firm for its clients.

### 2. The Executive Order singling out Jenner

On March 25, 2025, the President issued an Executive Order titled "Addressing Risks from Jenner & Block," JA2012-14, along with an accompanying "Fact Sheet," JA2016-17. The Order targets Jenner based on the clients it represents, the causes it supports, and its association with a former partner who has criticized the President.

**a.** The Order opens by proclaiming precisely why it directs penalties against Jenner. The Order says that "law firms" have engaged in "harmful activity" to "threaten public safety and national security, limit constitutional freedoms, degrade the quality of American elections, [and] undermine bedrock American principles." Order § 1. The Order then identifies three types of alleged "harmful activity" by Jenner: (1) the Firm's litigation adverse to the federal government on matters related to gender identity and immigration; (2) its purported "discrimination" in

employment practices; and (3) its affiliation with former partner Andrew Weissmann. *Id.*

In the first category, the Order condemns Jenner's legal representations at length. It wrongly accuses the Firm of pursuing "obvious partisan representations to achieve political ends"; "condon[ing] partisan 'lawfare'"; "support[ing] attacks against women and children based on a refusal to accept the biological reality of sex"; "back[ing] the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders"; and "engag[ing] in activities that undermine justice and the interests of the United States." Order § 1; *see* JA2017 (similar). The Order falsely claims that Jenner uses "hundreds of millions of [its] clients' dollars" to fund these and other pro bono representations "for destructive causes." Order § 1.

In reality, Jenner attorneys have donated their time to represent pro bono clients, using their and the Firm's own resources, in litigation adverse to the federal government—just as it has during prior administrations. *See* JA2045. As relevant to the Order, the Firm has represented clients pro bono in a wide range of matters, including cases

8

last year protecting asylum seekers and preserving civil rights for LGBTQ individuals.  JA2046-47.

Second, the Order baselessly asserts that the Firm "discriminates against its employees based on race and other categories prohibited by civil rights laws, including through the use of race-based 'targets.'" Order § 1.  The Administration cites no evidence to support those accusations, nor did it provide Jenner any process before issuing the Order.  *See* JA2188-89, JA2194-95.   Eight days before the Order, the Equal Employment Opportunity Commission issued letters to 20 other law firms "not[ing] concerns" about their employment practices, but did not issue such a letter to Jenner.  JA3220-22.

Third, the Order denounces Jenner's affiliation with former partner Andrew Weissmann.  Mr. Weissmann was a Jenner partner from 2006 to 2011 and 2020 to 2021.  JA2047.  He has frequently criticized the President on television and in a book and previously served on the Department of Justice team that investigated Russian interference in the 2016 election.  JA2047-48.  The Order charges that "Jenner was 'thrilled' to re-hire the unethical Andrew Weissmann after his time engaging in partisan prosecution as part of Robert Mueller's entirely unjustified

investigation" and asserts that there are "numerous reports of Weissmann's dishonesty." Order § 1. When signing the Order, which described Mr. Weissmann as a "Jenner employee," Order § 5, the President referred to him as "the main culprit with respect to this firm" and a "bad guy," JA2008. It does not appear the President was aware that Mr. Weissmann had left the firm four years prior.

**b.** After describing these motivations, the Order invokes a wide array of governmental powers to impose sweeping sanctions. When it comes to Jenner's personnel, the Order directs agency heads to "provide guidance limiting" Jenner employees' "engag[ement]" with federal employees and Jenner employees' "official access" to federal buildings. Order § 5. It bars agency officials from "hiring employees of Jenner." *Id*. And it mandates blanket "suspen[sion]" of "any active security clearances held by individuals at Jenner," followed by an unspecified "review." *Id*. § 2; *see* JA2016 (describing suspensions as "immediate[]").

When it comes to Jenner's business, the Order compels government contractors to "disclose any business they do with Jenner" regardless of "whether that business is related to the subject of the Government contract." Order § 3. It then requires agency heads to "terminate any

10

contract … for which Jenner has been hired to perform any service." *Id.* It also directs agencies to "otherwise align their agency funding decisions with the interests of the citizens of the United States," including by assessing "contracts … with entities that do business with Jenner" and taking "action[]" "with respect to those contracts." *Id.* The Fact Sheet states that this provision is intended "[t]o ensure taxpayer dollars no longer go to contractors whose earnings subsidize activities not aligned with American interests." JA2016.

Finally, when it comes to Jenner's hiring practices, the Order states that it does not "limit" the government's ability to "review the practices of representative large, influential, or industry leading law firms," and it cross-references a provision of the order targeting Perkins Coie LLP that mandated a review of law firms' employment practices. Order § 4; *see* JA488. The Fact Sheet clarifies that Jenner's employment practices "will be reviewed under Title VII." JA2017.

**c.** In using virtually every lever of government power to punish Jenner, the Order takes straight aim at the Firm's ability to represent its clients. Jenner's matters require regular appearances in federal court and frequent interactions with federal officials, JA2036-37, yet Jenner

11

attorneys were disinvited from one meeting with government officials a day after the Order issued, JA2050. Multiple Jenner personnel also possess and require security clearances to effectively represent their clients, JA2049, and one attorney's security clearance was suspended prior to the district court's entry of permanent injunctive relief, JA2155. As the Firm's Chairman explained, "the Order's restrictions on Jenner" would cause "devastating and irreparable" harm. JA2035.

### 3.    The campaign to punish law firms

Jenner was not the only firm targeted. The President issued nearly identical executive orders targeting other large law firms, including Perkins; Paul, Weiss, Rifkind, Wharton & Garrison LLP; Wilmer Cutler Pickering Hale and Dorr LLP; and Susman Godfrey LLP. JA487-89, JA1979-81, JA2332-35, JA3146-48; *see also* JA1950-51 (presidential memorandum concerning Covington & Burling LLP). Each order identifies and criticizes allegedly "partisan" litigation activities and disfavored associations of each firm.

Several firms challenged the orders; others did not. Illustrating the coercive power of the order, Paul Weiss opted to negotiate with the Administration. JA2163, JA1993. Under the resulting deal, Paul Weiss

12

agreed to "acknowledge[] the wrongdoing of [a] former partner"; "adopt[] a policy of political neutrality with respect to client selection and attorney hiring"; abandon its "'diversity, equity, and inclusion' policies"; and "dedicat[e] the equivalent of $40 million in pro bono legal services" to support specific causes identified by the Administration. JA2163. In exchange, the Administration revoked the Paul Weiss order. *See* JA1993-94, JA1996-97. Eight other firms then sought out their own deals, collectively pledging at least $900 million more to support the President's preferred causes. *See* JA2018-25, JA3172-73, JA3175-76.

### B. Proceedings Below

Jenner chose a different path: suing to safeguard its ability to represent its clients. Three days after the Order was issued, and the same day Jenner filed its complaint, the district court held a hearing and issued a temporary restraining order. JA1823-24.

Following a second hearing, the district court granted Jenner's motion for summary judgment and entered a permanent injunction. JA2207-08. The district court ruled that the Order "violates the First Amendment's central command that government may not 'use the power of the State to punish or suppress disfavored expression.'" *See* JA2157

13

(quoting *Vullo*, 602 U.S. at 188). In particular, the court found Jenner's First Amendment retaliation claim a "straightforward winner" given the Order's open declaration of its retaliatory intent and the "shared characteristic of the firms now threatened with [executive action]: speech the President dislikes." JA2167, JA2186-95. Because "[t]he order's incompatibility with the First Amendment suffice[d] to invalidate it," the court did not reach Jenner's remaining constitutional claims. JA2199.

## SUMMARY OF THE ARGUMENT

This case presents a straightforward but consequential constitutional question: May the government deploy the full machinery of executive power to punish law firms for the clients they represent, the positions they advance on behalf of those clients, and the attorneys they employ? The answer is no. As the district court recognized, the Executive Order clearly violates the Constitution—and no justiciability doctrine stands in the way of saying so. The court correctly invalidated the Order in full.

**I. A.** The Executive Order violates the First Amendment by openly retaliating against Jenner's protected expression. Jenner's choices about its client advocacy and associations lie in the First Amendment's

14

heartland; the Executive Order seeks to silence that expression. Nine other firms have caved to the Administration's threats, illustrating the coercive power of the orders. And the Order itself announces that Jenner's protected activity is its but-for cause. The government's contrary arguments distort what the Order plainly says and does.

**B.** The Executive Order additionally violates the First Amendment because it discriminates based on the viewpoints Jenner expresses on behalf of its clients; prohibits Jenner from petitioning the government; and demands compelled disclosure of attorney-client associations.

**C.** The Order violates the Constitution in numerous other respects. While the First Amendment arguments fully resolve this case, this Court can affirm the judgment below on any of those alternative grounds.

**II.** Rather than defend the Order on the merits, the government primarily contends that this Court is powerless to review it. The government's section-by-section reviewability arguments ignore that the Order has a cross-cutting, retaliatory motive. In any event, those arguments contravene settled law and fail on their own terms.

**A.** This Court has long recognized that challenges to "methods" used to inform the adjudication of security clearances are subject to

15

judicial review. Under that precedent, this Court is fully empowered to review the Order's change to established processes for adjudicating security clearances—namely, its creation of a bespoke suspend-first, review-later policy for all Jenner personnel.

**B.** The district court properly enjoined the provision of the Order that—as the accompanying Fact Sheet makes clear—directs federal agencies to single out Jenner's hiring practices for investigation based on unconstitutional retaliation.

**C.** Jenner's challenges to the Order's provisions concerning government contractors and access to federal buildings and officials are ripe for review. No amount of future guidance can cure an unconstitutional Executive Order. And any delay to adjudication would severely harm Jenner, whose attorneys were already excluded from a federal meeting pursuant to the Order prior to the district court's temporary restraining order.

**D.** The district court properly invalidated the entire Order, including Section 1, which sets forth the justifications for the directed actions. The President may speak as he wishes, but he may not issue a retaliatory Order that purports to have the force of law.

## ARGUMENT

## I.    THE EXECUTIVE ORDER IS UNCONSTITUTIONAL.

The central right guaranteed by the First Amendment is the "freedom to think as you will and to speak as you think." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660-61 (2000).  The Executive Order violates the First Amendment in targeting Jenner for protected expression—advocacy on behalf of its clients and association with a critic of the President.  And although the district court had no need to reach Jenner's other arguments, the Order also contravenes numerous other constitutional guarantees.

### A.    The Executive Order violates the First Amendment by retaliating against protected expression.

Rarely has a retaliation claim been so "straightforward." JA2167.  Often, retaliation cases require subtle inquiries into hidden motives.  *See Nieves v. Bartlett*, 587 U.S. 391, 403 (2019).  This Order is an open book.  It announces that it is targeting Jenner because of the Firm's core First Amendment activity: "courtroom advocacy on behalf of" its clients and their "chosen causes."  JA2168.  And the Order reaches for nearly every instrument of executive power to "muzzle" Jenner's advocacy.  JA2157.

17

Under this Court's three-part framework for assessing a First Amendment retaliation claim, Jenner has easily proven its case. First, Jenner has plainly "engaged in conduct protected under the First Amendment." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). Second, the "retaliatory action" was "sufficient to deter a person of ordinary firmness in [Jenner's] position from speaking again." *Id.* Finally, there can be no question that "a causal link" exists "between the exercise of a constitutional right and the adverse action taken against" Jenner, *id.*; the Order itself says so.

### 1. Jenner's advocacy and associations are protected under the First Amendment.

To its core, the First Amendment protects Jenner's practice of law. "[L]itigation [is] a vehicle for effective political expression and association," *In re Primus*, 436 U.S. 412, 431 (1978), and Jenner litigates some of the Nation's most significant cases for its clients. The Free Speech and Petition Clauses together protect "vigorous advocacy," *NAACP v. Button*, 371 U.S. 415, 429 (1963), and Jenner attorneys represent their clients in advocating to and against the government. Even in matters that never reach the public eye, Jenner's attorneys

18

engage in "speech" and "expression" by providing "advice … to the[ir] client[s]." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542-43 (2001).

The First Amendment also protects Jenner's decisions about who engages in legal practice as part of the Firm. "[I]mplicit in the right to engage in activities protected by the First Amendment" is "a corresponding right to associate with others" to carry out those activities. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). Because Jenner's work involves core "expression," its chosen "associations" are "entitled to the protections of the First Amendment." *Boy Scouts of Am.*, 530 U.S. at 648, 655, 658. So the government cannot "interfere with the internal organization or affairs" of the Firm by telling Jenner not to associate with a critic of the President. *Roberts*, 468 U.S. at 623.

None of this is a close call: In every respect, Jenner's speech and association are "high in the hierarchy of First Amendment values." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 101 (2018). "Speech by citizens on matters of public concern lies at the heart of the First Amendment." *Lane v. Franks*, 573 U.S. 228, 235 (2014). The right to petition the government, including through litigation, is "one of the most precious of the liberties safeguarded by the Bill of Rights." *Lozman*, 585

19

U.S. at 101. In assembling a firm of attorneys to represent clients, sometimes against the government and often on issues of significant public concern, Jenner's actions lie in the First Amendment's heartland.

"That this order targets lawyers magnifies its threat to the Constitution in other ways, too." JA2173. As the district court recognized, the Constitution respects "lawyers' importance in upholding our democracy," recognizing that "their independence is essential." *Id.* "[R]estriction on speech" by lawyers is particularly "problematic" because "[a]n informed, independent judiciary presumes an informed, independent bar." *Legal Servs. Corp.*, 531 U.S. at 545-46. And "[t]he right to sue and defend in the courts" is "the right conservative of all other rights." *Chambers v. Baltimore & Ohio R.R.*, 207 U.S. 142, 148 (1907). The ability of ordinary people to vindicate their rights depends on the independence of the bar. As the district court explained, "the First, Fifth, and Sixth Amendments speak in unison here," preventing "the administration's attempt 'to stifle any voice' Jenner and its clients 'might wish to raise before the courts in protest.'" JA2174 (citation omitted).

Everything the government says on the subject ignores bedrock First Amendment law. The government insists that, because the

20

President deems at least some litigation choices made by the law firms to be "misconduct" and "baseless," those choices fall outside of the First Amendment.  U.S. Br. 54.  But the "fixed star in our constitutional constellation" is that the government cannot "prescribe what shall be orthodox in politics … or other matters of opinion."  *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  That foundational rule prohibits the Executive Branch from unilaterally judging what litigation is improper.  And indeed, Jenner has repeatedly prevailed in court in the litigation the Order criticizes.  *See* JA2045-47.

The government next resorts to sleight-of-hand to argue that Jenner's choice to associate with Mr. Weissmann is unprotected conduct. The question is not whether Mr. Weissmann's "actions 'pursuant to [his] official duties'" in government receive First Amendment protection, U.S. Br. 54, but whether Jenner itself engaged in First Amendment-protected activity when it chose to "associate with" Mr. Weissmann "in pursuit" of its clients' ends, *Roberts*, 468 U.S. at 622.  The government does not engage with the relevant freedom-of-association principles.  And in any event, the government's theory fails on its own terms: As Judge Bates concluded, Mr. "Weissmann's criticisms of the President and

21

participation in a legitimate investigation" fall "easily within the First Amendment's" ambit. JA2168-69 (citations omitted).

### 2. The penalties in the Order deter expression.

The government does not even contest that the Executive Order's sanctions are "sufficient to deter a person of ordinary firmness in [Jenner's] position from speaking again." *Aref*, 833 F.3d at 258. As Judge Bates recognized, no "guesswork" is required: "The serial executive orders targeting law firms have produced something of an organic experiment, control group and all, for how firms react." JA2169. Following Paul Weiss's decision, eight other firms reached agreements to avoid Executive Branch retribution by "compromising speech"— including by changing their policies about what pro bono matters they will accept, "adopt[ing] a policy of political neutrality," and directing firm resources to causes the government supports. *Id.* The executive orders— even the threat of executive orders—are sufficient to chill many law firms. As the district court put it: "[I]t appears to take extraordinary firmness to resist." *Id.*

22

### 3. Jenner's protected conduct is a but-for cause of the Executive Order.

Finally, the Order "makes no bones about why it chose its target: it picked Jenner because of the causes Jenner champions, the clients Jenner represents, and a lawyer Jenner once employed." JA2157. It is therefore plain that "the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves*, 587 U.S. at 399. At a minimum, Jenner has shown that protected activity was "a substantial or motivating factor" of the adverse action, and the government cannot carry its burden to "show[] that the [action] would have been initiated without respect to retaliation." *Lozman*, 585 U.S. at 97.

**a.** The Order's plain text establishes but-for causation. The Order's first and most prominent charge is that Jenner engages in "partisan representations to achieve political ends," Order § 1—the very definition of First Amendment-protected speech on matters of public concern. And the Order specifically identifies disfavored representations on matters related to gender identity (the so-called "attacks against women and children") and immigration (the so-called "obstruction of efforts to prevent illegal aliens from committing horrific crimes"). *Id*. Those

23

statements confirm that the Order targets Jenner due to the Firm's First Amendment activity.

The Order next criticizes Jenner's protected conduct by complaining that Jenner hired Andrew Weissmann, who previously investigated the President while employed at the Justice Department and later criticized the President. Order § 1. The Order condemns Mr. Weissmann's perceived "political agenda" and says that Jenner's association with him is "a concerning indictment of Jenner's values and priorities." *Id.* In other words, the Order takes aim at Jenner because it dislikes Jenner's "selection of those with whom [it] wish[es] to join in a common endeavor." *Roberts*, 468 U.S. at 618; *see* JA1789 (describing Mr. Weissmann as "the main culprit" of Jenner's supposed wrongdoing).

Context corroborates the connection between Jenner's protected conduct and the Order's issuance. As the district court observed, the "series of executive orders" all target "law firms that, in one way or another, did not bow to the current presidential administration's political orthodoxy." JA2157. The Perkins order attacks that firm for filing litigation to "judicially overturn … election laws, including those requiring voter identification." JA487. The (later-revoked) Paul Weiss

24

order criticizes that firm for hiring another presidential critic and for bringing "a pro bono suit against individuals alleged to have participated in the events that occurred at or near the United States Capitol on January 6, 2021." JA1979. Echoing language in the Jenner Order, the WilmerHale order complains that the firm "engages in obvious partisan representations to achieve political ends," including by "supporting efforts designed to enable noncitizens to vote." JA2713-14; *see* JA2714 (criticizing WilmerHale's decision to hire two former investigators of the President). And the Susman order alleges that Susman "spearheads efforts to weaponize the American legal system and degrade the quality of American elections." JA3146. The pattern proves the point: Each firm, including Jenner, was targeted because of who its attorneys are and what its attorneys say in court on behalf of their clients.

**b.** The government's arguments blink reality. The government concedes that some of Jenner's conduct called out by the Order is constitutionally protected. *See* U.S. Br. 55. And, for the reasons already explained, the government is simply wrong that Jenner's litigation choices and associations fall outside of the protected category. *See supra* at 18-22. That leaves the government to insist that the Order has little

25

to do with its prominent criticisms of Jenner's "partisan representations" or "values and priorities." Instead, the government avows, the Order stems from a single sentence buried between those accusations, which asserts that "Jenner discriminates against its employees based on race and other categories prohibited by civil rights laws, including through the use of race-based 'targets.'" Order § 1. The government's claim that "the President would have issued the EOs" based on alleged discrimination alone is not plausible, and Judge Bates was right to reject it. U.S. Br. 55.

Start with the Order's text. If the government really would have issued the Order based on Jenner's purported (and unsubstantiated) discrimination alone, one would expect that concern to feature prominently. But the discrimination rationale gets "scanty treatment" in the Order, which devotes 90 words to criticizing Jenner's disfavored representations, 118 words to complaining about Mr. Weissmann, and a mere 23 words to the topic of Jenner's employment practices. JA2171. The government cannot seriously claim that one throwaway line is the sole but-for cause of the decision to target the Firm, and the rest is mere

26

window dressing. No reasonable person would write or read this Order that way.

And the government's discrimination sentence is conspicuously unspecific, especially in comparison to the rest of the Order. *See* JA2188 ("It is worth pausing to examine the defendants' bases, factual and legal, for accusing Jenner of discrimination. Factually, there is very little.… Legally there is not much more."). In court, the government's "sole support" is that Jenner adopted the "Mansfield Rule," a certification process in which "more than 360 law firms" participate. JA2194. The district court thus found that the government "fail[ed] to offer any reason that would justify singling Jenner out … aside from its speech." JA2194. Rather, "the shared characteristic of the firms now threatened" is "speech the President dislikes." *Id.*

The government's theory also contradicts what the Order does. An Order designed exclusively to address discrimination would never have immediately suspended all Jenner employees' previously granted security clearances or barred all Jenner personnel, from partners to mailroom staff, from speaking to federal officials, entering federal buildings, or obtaining federal employment. *See* Order §§ 2, 5(a)-(b).

27

Only retaliation for protected activity could possibly explain that collective punishment, which applies regardless of an employee's role in any hiring or employment activity.

Process irregularities further refute the government's discrimination rationale for the Order. No federal agency has found Jenner liable for wrongdoing in its employment practices or even opened a formal investigation into Jenner. The Order did not follow any fact-finding about Jenner's employment practices, cites no evidence in criticizing those practices, and did not follow the statutory and regulatory scheme that governs employment-discrimination law. *See, e.g.*, 42 U.S.C. § 2000e *et seq.* (Title VII). Surely an Administration seeking to address a concern about employment practices—and not focused on any forbidden purpose—would have adhered to established procedures in determining whether Jenner engaged in employment discrimination.

Finally, the Equal Employment Opportunity Commission's own actions put to rest any claim that anti-discrimination goals are the sole reason for the Order. Eight days before the Jenner Order, the Commission issued letters to 20 law firms "not[ing] concerns" about their "employment practices, including those labeled or framed as DEI."

28

JA3220-22. Whatever the merits of that investigation, Jenner does not appear on the Commission's list. And most of the firms on that list were not subject to any executive order (and did not ink any deal with the President). The way to explain that two-way mismatch is to recognize what is also plain from the Order itself: Rationales other than employment-law concerns—indeed, the criticisms of First Amendment-protected activity expressed in the Order's text—caused the President to target Jenner and the other appellees. Faced with this "disconnect between the decision made and the explanation given," courts are "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

## B. The Executive Order abridges the First Amendment rights to speak, petition, and associate.

In addition to retaliating against Jenner based on its past First Amendment-protected activity, the Order subjects Jenner to viewpoint-discriminatory restrictions on its right to speak and severe burdens on its rights to petition and associate.

**1.** As the district court observed, "all that need be said" on viewpoint discrimination "is said by the Executive Order itself." JA1872. A government policy treating Jenner differently because of its supposed

"partisan representations to achieve political ends" is a government policy that discriminates based on viewpoint. Order § 1. And the rash of executive orders singling out law firms for their advocacy further corroborates the district court's conclusion.

Nor is there any question that the Order meaningfully restricts Jenner's ability to advocate for its clients in the future. The Order limits where and to whom Jenner attorneys can speak. *See* Order § 5. And beyond those "direct prohibition[s] against the exercise of First Amendment rights," the Order casts a "chilling effect" on speech by Jenner and other firms representing clients with similar viewpoints. *Laird v. Tatum*, 408 U.S. 1, 11 (1972). It tells those firms that if they speak up on behalf of their clients, as Jenner did, then the full coercive power of the Executive Branch will turn on them next.

The government's brief effectively concedes that the Order is unconstitutionally viewpoint-discriminatory. Mirroring the Order, it charges that the targeted law firms "have taken actions that … limit constitutional freedoms, degrade the quality of American elections, and undermine bedrock American principles." U.S. Br. 4-5. That could be

30

the hornbook summary of viewpoint discrimination.  And the government nowhere argues that the Order's provisions withstand strict scrutiny.

2.    The Order independently violates the Petition Clause by prohibiting Jenner from engaging in future advocacy to "petition the Government for a redress of grievances."  U.S. Const. amend. I.  It impedes Jenner's ability to access "forums established by the government for resolution of legal disputes," including both Article I and Article III tribunals.  *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011).  And it "interfere[s] with [Jenner's] ability to express [its] views to a decisionmaker" by prohibiting Jenner from meeting with the Executive Branch on behalf of the Firm's clients.  *Am. Bus Ass'n v. Rogoff,* 649 F.3d 734, 741 (D.C. Cir. 2011) (emphases omitted).  Those restrictions trigger heightened scrutiny, *Button*, 371 U.S. at 438—a standard that the government does not endeavor to satisfy, *see* U.S. Br. 58-59.

3.    The Order additionally infringes on Jenner's constitutionally protected right to "associate with others"—specifically, the Firm's clients. *Roberts*, 468 U.S. at 622.  "[C]ompelled disclosure" of associations "may constitute as effective a restraint on freedom of associations as other forms of governmental action." *Ams. for Prosperity Found. v. Bonta*, 594

31

U.S. 595, 606 (2021) (alteration omitted). Compelled disclosure requirements are reviewed under "exacting scrutiny," requiring that the compelled disclosure be "narrowly tailored" to a "substantial" interest. *Id.* at 608, 618.

The Order's compelled-disclosure requirements "have the effect of curtailing the freedom to associate" and are subject to exacting scrutiny. *Ams. for Prosperity*, 594 U.S. at 616. The Order requires Jenner's government-contractor clients to "disclose any business they do with Jenner," regardless of "whether that business is related to the subject of [any] Government contract." Order § 3(a). The Order then directs agency heads to terminate "any contract … for which Jenner has been hired to perform any service." *Id.* § 3(b)(i). It further directs agency heads to "otherwise align their agency funding decisions with the interests of the citizens of the United States," including by assessing "contracts with Jenner or with entities that do business with Jenner." *Id.* § 3(b)(ii). The Fact Sheet elaborates that these provisions aim "[t]o ensure taxpayer dollars no longer go to contractors whose earnings subsidize activities not aligned with American interests." JA2016. Unsurprisingly given the Order's threats, one client "terminated [Jenner's] engagement" and

32

others "expressed concerns" about the disclosure requirement following the Order's issuance.  JA2052-53.

The government cannot satisfy exacting scrutiny.  The Order's stated interest is in "ensur[ing] that … federal funds are not flowing to entities that have engaged in racial discrimination."  U.S. Br. 57.  But the government may not "seek to leverage funding to regulate speech outside the contours" of its contracting relationships.  *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013).  And instead of focusing on Jenner's engagements that "relate[] to … government contracts," JA2192, the Order requires disclosure of "any business [that contractors] do with Jenner"—no matter how removed from government contracts.  Order § 3(a).  Therefore, the Order is not tailored to any legitimate (much less substantial) interest.

### C.    The Executive Order is contrary to numerous other constitutional principles.

Given its First Amendment ruling, the district court had no need to reach Jenner's additional "claims of unconstitutionality."  JA2207.  But the Executive Order also violates the Fifth Amendment's Due Process Clause, *see* Perkins Br. 38-40; Susman Br. 25-29, the Fifth and Sixth Amendments' right to counsel, *see* Perkins Br. 41-44, the Fifth

33

Amendment's equal-protection guarantee, *see id*. at 44-46, and the separation of powers, *see* WilmerHale Br. 26-29. This Court can affirm on those alternative grounds.

## II.    THE EXECUTIVE ORDER IS FULLY REVIEWABLE.

Unable to defend the executive orders on the merits, the government reaches for a grab bag of justiciability and remedial doctrines to argue that even if the orders are unconstitutional, courts are powerless to say so. These efforts to salvage the Order by preventing any merits review suffer from a cross-cutting flaw: They look at the executive orders piecemeal, rather than as an integrated set of sanctions against disfavored firms. Because the entire Order is retaliatory, the entire Order is unconstitutional. *See* WilmerHale Br. 30-33; Susman Br. 29-31. But even within the government's own flawed framework, its arguments fail: Each section of the Order is reviewable and unlawful, including when considered in isolation.

### A.    The Order's bespoke security-clearance process is reviewable.

The government is wrong to assert (at 20-40) that Section 2 of the Order, dictating a new method for adjudicating Jenner employees' security clearances, is immune from judicial scrutiny. Both precedent

34

and common sense support judicial review of a bespoke process that suspends the security clearances of Jenner employees immediately and on a blanket basis.

1.  The district court properly followed the lines established by the Supreme Court and this Court in ruling that Jenner's challenge to the Order's security-clearance provision is reviewable.  In *Department of Navy v. Egan*, 484 U.S. 518 (1988), the Supreme Court held that the "grant of [a] security clearance to a particular employee" is "committed by law to the appropriate agency of the Executive Branch."  *Id.* at 527. The Court reasoned that a "[p]redictive judgment" about an "individual's future actions" and "influences" must "be made by those with the necessary expertise in protecting classified information" within "the agency responsible" for such clearance decisions.  *Id.* at 529.

At the same time, under *Egan*, "[i]t is simply not the case that all security-clearance decisions are immune from judicial review."  *Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d 286, 289 (D.C. Cir. 1993).  This Court has explained that challenges "to the constitutionality of the methods used to gather information" relating to security-clearance decisions do not fall within *Egan*'s holding.  *Id.* at 290.  "The end may be

legitimate, its accomplishment may be entrusted solely to the President, yet the judiciary still may properly scrutinize the manner in which the objective is to be achieved." *Id.*

Treating the "substance of" a particular individual's clearance revocation differently from the revocation process itself makes sense: Only the former implicates *Egan*'s concern about second-guessing "[p]redictive judgment[s]" about an individual's "future behavior." 484 U.S. at 528-29; *see Stehney v. Perry*, 101 F.3d 925, 932 (3d Cir. 1996) (collecting additional cases stating the same rule). That precedent reflects a general rule, across contexts, that courts may "review … constitutional claims challenging the process by which unreviewable determinations were reached," including "the President's determination[s]" about "threat[s] [to] national security." *Ralls Corp. v. CFIUS*, 758 F.3d 296, 311, 314 (D.C. Cir. 2014). Thus, "[t]o stretch *Egan* to cover" cases challenging the method of adjudicating security clearances "would be to endorse untenable, and far-reaching, restrictions on judicial review of governmental actions." *Greenberg*, 983 F.2d at 290.

When changes to the methods used in security-clearance determinations are set out in a policy document like an executive order,

judicial review is even easier. The federal courts are well-suited to assessing the legality of a federal policy change, *see Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996)—indeed, they routinely adjudicate constitutional challenges to executive orders and other policy pronouncements. The standards for reviewing such challenges, including First Amendment retaliation claims, are both "manageable" and well-established. *Baker v. Carr*, 369 U.S. 186, 217 (1962).

The Administration's decision to announce a new and bespoke clearance process for Jenner personnel accordingly falls outside of *Egan*'s bar on judicial review of individualized security-clearance determinations. Section 2 of the Order is a blanket policy, directing immediate action "to suspend any active security clearances held by individuals at Jenner," regardless of any individual characteristics, with some undetermined "review" thereafter. Order § 2(a). In challenging that suspend-first, review-later command, Jenner contests "the constitutionality of the methods used to gather information" in adjudicating security clearances, *Greenberg*, 983 F.2d at 290, rather than any judgment about the fitness of any "particular employee" to hold a

clearance, *Egan*, 484 U.S. at 527. "[I]ndeed," as the district court noted, the Order "doesn't even permit" individualized assessments prior to suspension. JA2178. Thus, reviewing Jenner's claim does not require scrutinizing the kind of "expert, predictive judgment made by 'appropriately trained' personnel that *Egan* insulates from judicial review." *Rattigan v. Holder*, 689 F.3d 764, 767 (D.C. Cir. 2012).

The broader context further strengthens the case for reviewability. The security-clearance provisions do not stand alone; they are but one part of a sweeping and integrated scheme of penalties, all expressly motivated by a desire to punish the Firm for its protected advocacy and associations. "Section 2, in other words, is about using another lever in the President's arsenal to extinguish speech he dislikes." JA2181. The Order as a whole obviously does not represent a security-clearance-specific "predictive judgment." *Egan*, 484 U.S. at 527, 529. And the President has told us precisely why he issued this unprecedented set of sanctions—to retaliate against Jenner and other firms due to their representations of clients and associations with people the President dislikes. The wide-ranging sanctions and overtly retaliatory nature of the Order put this case light-years away from *Egan*.

38

**2.** The government's contrary position does not withstand scrutiny. On the government's view, courts would be powerless to act if a future president announced a blanket policy of automatically denying clearances for all Republican donors, all adherents of the Catholic faith, or all individuals who have criticized the President on social media. *Contra Gill v. U.S. Dep't of Just.*, 875 F.3d 677, 684-85 (D.C. Cir. 2017) (Tatel, J., concurring) ("[I]f Gill could show that the government has a policy or practice of treating Muslims or naturalized citizens differently, his equal protection claims, like the claims at issue in *Greenberg*, would not be barred by *Egan*."). As Judge Bates put it, "[t]he Constitution does not tolerate such judicial abdication." JA2179. And the government never explains why reviewing such across-the-board policies would require courts to engage in any "sensitive and inherently discretionary judgment call." *Egan*, 484 U.S. at 527. Nor does it explain why such suits fall outside of the traditional judicial function of reviewing executive policymaking.

Though the government spills much ink on the subject (at 25-29), *Lee v. Garland*, 120 F.4th 880 (D.C. Cir. 2024), does not support the government's far-reaching theory. *Lee* addressed First Amendment,

39

Fifth Amendment, and Title VII challenges to the denial "of a security clearance to a particular employee" based on an extensive individualized review by expert personnel. *Id.* at 884-85, 893. Following their typical procedures, two agencies had determined that Lee, an FBI employee, should no longer have a clearance after he failed three polygraph examinations. *See id.* at 884-85. In rejecting Lee's challenges, the Court held that claims regarding "the merits of any 'particular employee's security clearance'" are unreviewable, including if the claims arise under the Constitution. *Id.* at 893. The Court also explained that Lee did "not seek relief against an agency decision discrete from the revocation decision," but instead "challenge[d] the substantive basis for [the] decision" itself. *Id.* at 894.

The *Lee* Court thus did not consider, much less foreclose, challenges like Jenner's—that is, challenges to policies that establish a new clearance process for a class of individuals on constitutionally suspect grounds. Just the opposite: *Lee* made clear that it was not displacing *Greenberg*'s holding that courts may review policies governing the "methods" used to inform the adjudication of clearances, including for compliance with the Constitution. 120 F.4th at 892 (quoting *Greenberg*,

40

983 F.2d at 290).  As the *Lee* Court noted, "[i]n allowing judicial review of these claims, [this Court] stressed that the *Greenberg* plaintiffs did not seek review of 'discretionary judgments' regarding the merits of any 'particular employee's security clearance.'"  *Id.* at 893.  Neither does Jenner, for the reasons already explained.

Because *Lee* does not bar Jenner's actual claims, the government contorts those claims by contending the Firm seeks to litigate the "substance of the President's security clearance determinations."  U.S. Br. 32.  But the government's best supposed evidence—the district court's statement that "the President ordered the Jenner-specific process in retaliation for Jenner's protected speech"—refutes its argument.  *Id.* at 38 (quoting JA2179).  Holding that a "process" violates the Constitution is different than second-guessing any particular security-clearance determination.  And *Greenberg* permits that holding.  *See* 983 F.2d at 289-90.

The relief issued by the district court does not change the analysis. The "retrospective relief" that the court entered—reversing any security-clearance suspensions made pursuant to the Order—hardly supports the government's claim that this "case cannot possibly be about … process."

U.S. Br. 32, 34. After all, courts regularly invalidate governmental actions for lack of adequate *process*. *See, e.g.*, *Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 72 F.4th 1324, 1343 (D.C. Cir. 2023). And it is settled law that a "mandatory injunction" can "restore the status quo" prior to the defendant's illegal act. *Porter v. Lee*, 328 U.S. 246, 251 (1946). The district court's status quo-restoring injunction thus does not suggest that Jenner brings substantive claims rather than procedural ones.

In the end, the government abandons its attempt to square its position with *Greenberg* and this Court's case law. Citing precedents involving distinct legal questions in unrelated statutory schemes, the government asserts "[i]t is well settled that, when an administrative decision is unreviewable a court 'may not inquire' whether it is 'procedurally defective' either." U.S. Br. 33 (quoting *Amgen Inc. v. Smith*, 357 F.3d 103, 113 (D.C. Cir. 2004)); *see id.* (asserting that "the difference between the method and the substance of the revocation is illusory"). But *Greenberg* expressly rejects that view, explaining that "the judiciary still may properly scrutinize the manner in which the objective is to be achieved" even where a particular "end" is "entrusted solely to the President." 983 F.2d at 290. The government cannot simply whistle past

42

that controlling precedent, which confirms that "Jenner's claim does not ask a political question; it asks a legal one." JA2179.

*    *    *

Under our Constitution, the Executive Branch wields considerable power over whom to entrust with the Nation's secrets. *See Egan*, 484 U.S. at 527-30. And because courts are ill-equipped to make sensitive, predictive decisions about a particular individual's trustworthiness, *Egan* and *Lee* insulate such decisions from judicial review. But when a president issues an executive order that leverages the security-clearance process to retaliate against a law firm for its client advocacy and associations, no precedent of any court suggests that the judiciary is powerless to act. This Court should reject the government's request to extend *Egan* and *Lee* to Executive Branch policies changing the method of adjudicating clearances on unconstitutional grounds.

### B.    The Order's instruction to investigate Jenner is reviewable.

The government is also flat wrong (at 41-48) that Section 4 of the Order, directing an investigation of Jenner's hiring practices, is immune from judicial scrutiny.

43

The government's lead argument—that Section 4 does not "single[] out" Jenner at all, U.S. Br. 46—is "implausibl[e]" in context, JA2194. The government claims that Section 4 merely "references" what the Equal Employment Opportunity Commission is "*already* … supposed to be doing," and nowhere targets Jenner specifically. U.S. Br. 42, 46. But the Fact Sheet makes clear that, due to the Order, "the practices of Jenner will be reviewed under Title VII." JA2017. The government cannot seriously maintain that Section 4 of an Order called "Addressing Risks from Jenner & Block" has nothing to do with Jenner & Block.[1]

And because Section 4 retaliates against Jenner, it makes no difference that the government has statutory authority to "investigate invidious discrimination" in general. U.S. Br. 41. That authority does not include the power to direct investigations for retaliatory aims: As this Court recently observed, "all investigative techniques are subject to abuse and can conceivably be used to oppress." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 580 (D.C. Cir. 2025). The government may not launch "a campaign of retaliation, including an investigation, … in

---

[1] Thus, Jenner has "standing" to challenge the Order. *Contra* U.S. Br. 46.

response to [Jenner's] exercise of [its] First Amendment rights." *Id.* at 581.

Of course, that does not mean Jenner is exempt from ordinary scrutiny. Jenner "does not complain of being vulnerable to investigation on equal terms with the rest of the country"; "[i]t objects to being a guaranteed subject of investigation because of its speech" and associations. JA2194. The district court properly protected Jenner against that retaliatory act.

## C. The Order's disclosure requirements and access restrictions are reviewable.

The government is additionally mistaken (at 48-52) that the Order's restrictions related to federal contractor clients and Jenner employees' access to federal buildings and federal officials are not ripe for challenge. Prudential-ripeness doctrine asks "whether the factual record was sufficiently developed, and whether hardship to the parties would result if judicial relief is denied at this stage." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014). Both prongs support immediate review of Section 3 and Section 5.

The factual record is sufficiently developed because the issues presented are "purely legal." *Teva Pharms. USA, Inc. v. Sebelius*, 595

F.3d 1303, 1308-09 (D.C. Cir. 2010). If the President retaliated or discriminated against Jenner in violation of the First Amendment, then there is "no exclusion of Jenner employees from federal buildings, no bar of Jenner employees from interacting with federal employees, and no federal hiring ban on Jenner employees that would pass constitutional muster." JA2197. Thus, it is unnecessary to await any future "guidance" contemplated in Section 5(a) or "assessment" required by Section 3(b)—those actions could not alter the constitutional analysis.[2] Notably, the government does not contend otherwise: Absent from its brief is any explanation of how these further developments would affect whether the Order violates the First Amendment.

Meanwhile, Jenner would face immense "hardship" from any delay to review. The government's claim that access restrictions were not "implemented" is simply false. U.S. Br. 4. The day after the Order issued, "the Department of Justice notified" a Jenner client that the client "could not bring their counsel from Jenner to a meeting with the

---

[2] The compelled disclosures in Section 3(a) and the hiring ban in Section 5(b) do not depend on future agency action, making the government's ripeness argument as to those provisions deficient on its own terms. In addition, the government has nothing to say about Section 2(b) and forfeits any argument as to that provision.

46

Department of Justice that was scheduled for April 3." JA2050; *see id.* (noting that the Department reversed course after the temporary restraining order). More broadly, these aspects of the Order cast an immediate "chilling effect" on Jenner's protected advocacy, *Laird*, 408 U.S. at 11, including because Jenner's clients expressed concern about continuing to retain the Firm if the Order remained in effect, JA2052-53. The government utterly ignores these inconvenient facts.

Contrary to the government's newly raised contention, it is neither correct nor relevant to characterize Jenner's challenge as "facial." U.S. Br. 50-51. A "facial" challenge seeks to "invok[e] the rights of others," while Jenner claims that the Order "burdens [its] own speech" and association. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 569 (2011). Regardless, a facial challenge would succeed because there is no "plainly legitimate sweep" to a retaliatory and viewpoint-discriminatory Order. *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024).

### D. The Order's statement of Administration policy is reviewable.

Finally, the district court correctly recognized that "retaliatory motive infects the entire order," including the Order's many statements about Jenner found in Section 1. JA2171 n.9. For that reason, the

47

district court properly declared the entire Order "null and void." JA2209. The government's severability arguments (at 63-64) do not grapple with that point. And although the government is correct that the President can "make statements," an Executive Order is not mere "government speech." U.S. Br. 60-61. After all, the preamble states "it is hereby ordered," making clear that the Order as a whole—including Section 1—directs action. Order pmbl.; *see* Order § 6(b) (recognizing that the Order "shall be implemented"). The President can speak as he wishes, but he cannot "order" retaliation against Jenner and its clients.

*　　*　　*

The legal profession's independence from government coercion is fundamental to the rule of law. If the government may punish firms for the clients they represent, the positions they advocate, and the attorneys they employ—and if courts are powerless to provide a remedy—then the legal system as a whole stands to lose. The Constitution prohibits that untenable result.

# CONCLUSION

The judgment of the district court should be affirmed.

Dated: March 27, 2026

Respectfully submitted,

*/s/ Elizabeth B. Prelogar*

KATHLEEN R. HARTNETT
MIRANDA LI
COOLEY LLP
3 Embarcadero Center
20th Floor
San Francisco, CA 94111
(415) 693-2000

ELIZABETH B. PRELOGAR
JOSHUA REVESZ
JADE FORD
COOLEY LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004
(202) 842-7800

MICHAEL A. ATTANASIO
COOLEY LLP
10265 Science Center Drive
San Diego, CA 92121
(858) 550-6000

*Counsel for Appellee Jenner & Block LLP*

# CERTIFICATE OF COMPLIANCE

I certify that:

1.    This brief complies with this Court's Order of February 6, 2026, because it consists of 9000 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced, serif typeface in 14-point Century Schoolbook font.

*/s/ Elizabeth B. Prelogar*
Elizabeth B. Prelogar